## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CR NO. 22-309 (TNM)** |
| | : | |
| **ARTIE BYRD,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S MOTION TO DISMISS

The defendant, Artie Byrd, requests that the Court dismiss the indictment in this case, as it violates the second amendment. The indictment charges one count of a violation of 18 U.S.C. § 922(g), possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year.

18 U.S.C. § 922(g)(1)'s prohibition on felons possessing firearms is unconstitutional under the Second Amendment. The conduct prohibited by Section 922(g)(1), namely possessing and carrying a firearm, is covered under the plain text of the Second Amendment. The Government cannot establish that an effectively lifelong ban on all people convicted of felonies is supported by analogous founding-era regulations. This Court must therefore dismiss the indictment.

## DISCUSSION

## I. INTRODUCTION

In the years following the Supreme Court's seminal decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), circuit courts around the country developed a two-step framework for Second Amendment cases that looked first to history and tradition, then to a

means-end analysis when assessing the constitutionality of firearms regulations. But in 2022, the Supreme Court rejected this two-step approach as "one step too many." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022). Under *Bruen*, the correct approach for assessing the constitutionality of a law under the Second Amendment is as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. Only after the Government meets its burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

Although authority prior to *Bruen* upheld Section 922(g), when analyzed under *Bruen*'s renewed focus on whether laws are consistent with the original public understanding of the Second Amendment right, Section 922(g)(1) is plainly unconstitutional. The conduct prohibited by Section 922(g)(1), namely the possession of a firearm in or affecting interstate commerce by a person convicted of a felony, is covered by the text of the Second Amendment: "[T]he right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Mr.Byrd's status as a felon does not affect his membership in the national community, or "the people" for Second Amendment purposes, *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (noting that "[n]either felons nor the mentally ill are categorically excluded from our national community"), *abrogated by Bruen*, 142 S. Ct. 2111; *United States v. Banuelos*, No. EP-22-CR-00903-FM, 2022 WL 17752205,

at *3 (W.D. Tex. Nov. 10, 2022), just as his felony conviction does not exclude him from "the people" for First Amendment or Fourth Amendment purposes, *see, e.g.*, *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 WL 431037, at *18 (S.D.N.Y. Jan. 26, 2023); *United States v. Carrero*, No. 22-cr-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (applying the presumption of consistent usage to the term "the people" as used in the U.S. Constitution). As the conduct relevant here, the carrying of a firearm on one's person, is covered by the plain text of the Second Amendment, this conduct is "presumptively" protected by the U.S. Constitution, unless the Government can meet its burden of proving that Section 922(g)(1) is consistent with a historical tradition of firearm regulation in the United States. *Bruen*, 142 S. Ct. at 2129-30. To meet this burden, the Government must identify historical examples of regulations sufficiently analogous to the modern regulation such that the modern restriction is consistent with the public understanding of the right to bear arms at the time of the Second Amendment's ratification. *Id.* at 2131-34.

As the Supreme Court explained in *Bruen*, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Felons have existed since long before the founding era, and therefore regulations addressing the possession of firearms by felons should certainly fall within this category.

Just yesterday, in an exhaustive opinion following the analysis set forth in *Bruen*, the Third Circuit held that §922(g) is unconstitutional. *Range v. Att'y General*,

3

No. 21-2835 (3d Cir. June 6, 2023) (en banc). The court in *Range* rejected every argument made by the government as to why Section 922(g) was constitutional.

The court in *Range* first determined that *Range* was one of "the people" mentioned in the Second Amendment. *See id.* at *11. The court set forth four reasons that he is. First, the overused phrase "law-abiding, responsible citizens" in *Heller*, *McDonald*, and *Bruen* was dicta. *Id.* at *11. Second, since felons have the right as "the people" to assemble peacefully, petition for redress, and be protected under the Fourth Amendment, they too have the right to bear arms. *Id.* at *12. This is true unless the meaning of "the people" varies from Amendment to Amendment, which *Heller* says it does not. *Heller*, 554 U.S. at 580. Third, as then-Judge Barrett stated in *Kanter v. Barr*, "all people have the right to keep and bear arms," though the legislature may "strip certain groups of that right." *Id.* at *13. Finally, the phrase "law-abiding reasonable citizens" is too vague and arbitrary and such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Id.* at *14.

The second issue decided in *Range* was whether §922(g)(1) regulates Second Amendment conduct. The court very succinctly stated "it does." *Id.* at *15 (citing *Heller*, 554 U.S. at 584, and *Bruen*, 142 S. Ct. at 2126).

Finally, the third and most critical issue was whether the government was allowed to strip Range of his right to bear arms. *Id.* at *15. The government has the burden to "demonstrate[e] that it is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and the court found the Government

did not carry that burden because it did not show that the United States has a long standing history of depriving felons of the right to possess firearms. *Id.* at *15.

First, the court in *Range* noted that the first federal regulation of firearms, in 1938, was only applied to violent criminals. *Id.* at *17. Second, this 1938 statute was still too late to fall under the necessary definition of "historical tradition."*Id.* at *18 n.8 ("20th century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence" (quoting *Bruen*, 142 S. Ct. at 2154 n.28)). Third, the court in *Range* refuted the Government's theory that legislatures traditionally used status-based restrictions, stating that the analogy to the disarmament of "Loyalists, Native Americans, Quakers, Catholics, and Blacks" has nothing to do with felons and is "far too broad."  *Id.* at *18-19.

The *Range* court also rejected the government's argument that historically felons received more severe punishments compared to losing the right to bear arms. It stated that even though "founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue – lifetime disarmament – is rooted in our Nation's history and tradition." *Id.* at *19. More so, after completing a sentence, a felon was allowed to "repurchase arms," and thus §922(g)(1) is not "relevantly similar" to earlier statutes. *Id.* at *20. There were laws that required forfeiting one's guns but "government confiscation of the instruments of a crime . . . differs from a status-based lifetime ban on firearm possession." *Id.* at *20. The court added that "even arms used to commit crimes bordering on treason were sometimes returned to the perpetrators during the Founding era." *See id.* at *21 n.10.

Judge Porter concurred, reviewing the history that, before the New Deal, "Congress was powerless to regulate gun possession and use." *Range*, at *4 (Porter, concurring) (citing *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (Congress lacks power to infringe the right declared by the Second Amendment)). Judge Porter also looked to state statutes and explained why those are not relevant to the argument at hand. *Id.* at *5. He emphasized that the states had "sweeping police power" that the national government did not have, which is the exact reason why the states were able to regulate possession of weapons while the federal government was not. *Id.* at *5. Moreover, Judge Porter noted that the challenge to Section 922(g) is not about state law: "it is a challenge to the constitutionality of a relatively recent federal statute that has no historical analogue in antebellum federal law." *Id.* at *5.

Mr. Byrd recognizes that the D. C. Circuit, in a case decided three years before *Bruen*, upheld Section 922(g) against a similar challenge, in *Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019). The court in *Medina*, however, applied the two-step analysis that *Bruen* held was improper. 913 F.3d at 157. In addition, the court in *Medina* failed to engage in the proper analysis as set forth in *Bruen*, as discussed more fully below.

As the court correctly found in *Range*, scholars have not identified any laws from near the time of the founding that prohibited those convicted of crimes from possessing firearms. *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. REV. 1551, 1563 (2009). Federal law did not prohibit felons from possessing firearms until 1938 (almost 150 years after the states ratified the Second Amendment), and even then, only prohibited firearms possession for those convicted of certain violent

offenses. *See generally United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing Federal Firearms Act, ch. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). In 1961, the prohibition was expanded to all felons, then in 1968, Section 922(g)(1) was amended to its current form. *Id.* At the state level, laws prohibiting felons from carrying concealable firearms appear to have been nonexistent until New York adopted a provision that operated to automatically revoke carry licenses from convicted felons in 1917. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009) (citing 1917 N.Y. Laws 1643). Other states began enacting prohibitions on firearms possession by felons in the following decade. *See id.* Therefore, although dicta in *Heller* and *McDonald* said that those opinions should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626; *see also McDonald*, 561 U.S. at 786 (plurality opinion), such prohibitions are in fact not-so longstanding. In all cases, the historical prohibitions on the possession of firearms by felons are less-longstanding than the "good moral character" and "proper cause" concealed carry regulations that the Supreme Court struck down in *Bruen*. 142 S. Ct. at 2122.

As the Court acknowledged in *Heller*, it did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" in that case. 554 U.S. at 626. Therefore, this dicta should not be treated as a holding of the Supreme Court, but instead a caveat describing the Court's view of the extent of its holding *in that case*. This "presumption," perhaps more accurately described as an "assumption," does not hold up when felon-in-possession laws are scrutinized under the analytical framework required by *Bruen*.

7

To the extent that the Government attempts to draw analogies between Section 922(g)(1) and (1) founding era regulations restricting the right of "disloyal subjects" or certain religious or racial minorities from possessing firearms, (2) so-called "going armed" statutes, or (3) surety statutes, all of which the Government has relied on in other cases, the analogies fail because the "how and why" of the way these regulations restricted the right to bear arms are not sufficiently analogous to Section 922(g)(1). *Cf. United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023) (rejecting the Government's argument that these three categories of founding era laws were analogous to and therefore established the constitutionality of Section 922(g)(8)), *petition for cert. filed*, No. 22-915 (U.S. Mar. 21, 2023). Relevant historical examples falling into the first category deal with disarming groups "thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status." *Id.* at 457. Such restrictions appear intended to address threats of political violence and rebellion, rather than generalized public safety concerns attributable to an individual's past conduct. *See id.* (explaining that the "purpose of laws disarming 'disloyal' or 'unacceptable' groups was ostensibly the preservation of political and social order, not the protection of an identified person from" a specific type of violence, and that such laws were therefore not sufficiently analogous to Section 922(g)(8)). The second category of regulations are likewise inapposite because they do not reflect a National tradition of firearm forfeiture. *Id.* at 458 (explaining that, of the four such statutes identified, one never had a forfeiture provision, two removed their forfeiture provision "early on"). Further, the "going armed" laws were "aimed at curbing terroristic or riotous behavior" by individuals specifically "adjudicated to be a threat to society

generally, rather than to identified individuals." *Id.* at 459. And finally, the surety laws are inapposite because, unlike Section 922(g)(1), "historical surety laws did not prohibit public carry, much less possession of weapons, so long as the offender posted surety." *Id.* at 460. Therefore, this "conditional" restriction on the Second Amendment right is not analogous to the felon in possession statute, which operates as a life-long, absolute deprivation of the right. *Id.*

Some courts have endorsed the so-called "virtuous citizen" theory in gun cases. *See generally Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (collecting cases). Under this theory, the Government is at liberty to disarm any person it deems "unvirtuous," namely those who are not, in its view, "law-abiding, responsible citizens." *Rahimi*, 61 F.4th at 451. But the "virtuous citizen" theory is premised on a flawed misreading of *Heller* that attempts to rewrite the Second Amendment as limiting the right to keep and bear arms to only the "law-abiding" people, however the Government defines that group. Rather than defining the scope of the Second Amendment itself by using the term "law-abiding citizens," as the Government has argued, the Supreme Court's use of that term in *Heller* and *McDonald* only served to limit the scope of its *holdings in those cases. Cf. Rahimi*, 61 F.4th at 452. This is not to say that the Supreme Court actually decided any issue not before it in those cases, such as whether Section 922(g)(1) is unconstitutional. Further, the "virtuous citizen" theory lacks any true limiting principle and is ripe for abuse and overreach. Indeed, according to this theory, the Government's power to strip people of their Second Amendment rights could be expanded to any group imaginable that the Government deems not to be "virtuous." *See, e.g.*, *id.* at 453.

9

In any event, the "virtuous citizen" theory conflicts with *Bruen* because the theory turns on whether a person is entitled to the protections of the Second Amendment based on their status. To the contrary, *Bruen* clearly instructs that the focus must be on whether the *conduct* at issue is covered by the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2129-30. Whether the Government has the power to strip away a person's rights by virtue of a felony conviction, consistent with the Nation's historical tradition of firearm regulation, is a separate issue from whether the person has the right in the first place. *See generally Kanter*, 919 F.3d at 452-53 (Barrett, J. dissenting).

For these reasons, and those set forth in more detail below, the D.C. Circuit's pre-*Bruen* holding in *Medina v. Whitaker* that "felons are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment," 913 F.3d at 154, and its earlier decision in *Schrader v. Holder* that Section 922(g)(1) was facially constitutional based on an intermediate scrutiny analysis, 704 F.3d 980, 988-91 (D.C. Cir. 2013), were both abrogated by *Bruen*. A fresh historical analysis under the standard articulated in *Bruen* is needed.

Whether the Government has the authority to strip any particular group, including felons (or some subset thereof), of their Second Amendment rights is a question that rises or falls solely on the Government's ability to meet its burden to establish that such a restriction is consistent with the Nation's history of firearm regulation. The Government cannot meet its burden for the federal felon in possession statute. Therefore, because Section 922(g)(1) is unconstitutional, the indictment against Mr. Byrd must be dismissed.

## II. SECTION 922(G) IS UNCONSTITUTIONAL

**A.**     **The Correct Legal Standard**

The Second Amendment protects the "individual right to possess and carry weapons." *Heller*, 554 U.S. at 592. In *Bruen*, the Supreme Court articulated the standard for determining whether a law restricting that right is constitutional as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30. This standard turns to history for evidence of whether a governmental regulation is consistent with the pre-existing right to keep and bear arms, as the right was understood when it was codified in the Second Amendment. *Id.* at 2130. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

*Bruen* unambiguously commands that Second Amendment analysis begins with determining whether the relevant "*conduct*" is covered by the plain text of the Amendment. 142 S. Ct. at 2129-30 (emphasis added). Many courts have since determined that it is improper to focus on "potentially disqualifying status characteristics" that would arguably remove a person from the Second Amendment. *See, e.g.*, *Rowson*, 2023 WL 431037, at *15 (collecting cases); *Banuelos*, 2022 WL 17752205, at *3 (collecting cases in accordance but noting that some district courts disagree). Instead, these cases determine that the Second Amendment does in fact cover all members of the national community, including felons, and then appropriately

11

analyze whether the Nation's historical tradition of firearms regulation allows for the prohibition at issue. *See Rowson*, 2023 WL 431037, at *15 (citing *Bruen*, 142 S. Ct. at 2126, 2134-35 and collecting cases); *Banuelos*, 2022 WL 17752205, at *3 & n.36 ("*Bruen*'s first step does not contemplate the actor or subject. Defendant's status as a felon is therefore irrelevant at this stage of the analysis. Instead, his possession of a firearm is 'presumptively constitutional.'" (emphasis and footnote omitted)). This is because the term "the people," as used in the Second Amendment is a "term of art" that covers the "national community." *Heller*, 554 U.S. at 580 (quoting another source). As used in the Second Amendment and elsewhere in the Constitution, the term "unambiguously refers to *all members* of the political community, *not an unspecified subset*." *Id.* (emphasis added). The term "the people" must be interpreted consistently throughout the Constitution, such that "the people" protected by the First and Fourth Amendments are also protected by the Second Amendment. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *see also Rowson*, 2023 WL 431037, at *17 (explaining that the Government's argument the felons are excluded from "the people" protected by the Second Amendment conflicts with *Heller*); *Banuelos*, 2022 WL 17752205, at *3; *Carrero*, 2022 WL 9348792, at *2 (declining to "carve out felons from the scope of the Second Amendment's protection of 'the people'" before assessing the Government's historical justification for Section 922(g)(1) (citation omitted)). As then-Judge Barrett explained in her dissent in *Kanter v. Barr*, "[n]either felons nor the mentally ill are categorically excluded from our national community." 919 F.3d at 453 (Barrett, J., dissenting). Felons, including Mr. Byrd, are therefore part of "the people" as that term is used in the Second Amendment

and throughout the Constitution. "How [a person's] prior felony might impact his Second Amendment right to possess a firearm is more properly assessed under [*Bruen*] step two's historical tradition analysis." *Banuelos*, 2022 WL 17752205, at *3.

When assessing whether "conduct" falls within the scope of the Second Amendment, courts must focus on the "'normal and ordinary meaning' of the Second Amendment's language." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576-77). The "arms" protected by the Second Amendment include firearms "in common use at the time." *Heller*, 554 U.S. at 627. Today, handguns are "the most popular weapon chosen by Americans for self-defense" and are considered "the quintessential self-defense weapon." *Id.* at 629. To "keep" arms means simply to "have weapons." *Id.* at 582. To "bear" arms means, among other things, to "carry" them, such as "upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). Therefore, the act of carrying a handgun on one's person is covered by the Second Amendment's plain text and is "presumptively" protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2129-30.

The Government then bears the burden of proving that the regulation at issue is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. In certain cases, such as this one, the historical "inquiry will be fairly straightforward," such as where "a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. In such cases, "the lack of a distinctly similar historical regulation addressing the problem is relevant evidence

13

that the challenged regulation is inconsistent with the Second Amendment." *Id.*
Similarly, if the founding generation addressed a similar problem "through materially
different means," that too may evidence that the modern law is unconstitutional. *Id.*
Further, if an analogous proposal from the founding generation was rejected as
unconstitutional, the rejection would be "probative evidence of unconstitutionality."
*Id.*

The Government must identify a "well-established and representative historical
analogue," though this need not be "a historical twin." *Id.* at 2133 (emphasis omitted).
However, that is not to say that courts should "'uphold every modern law that
remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers
that our ancestors would never have accepted.'" *Id.* (quoting *Drummond v. Robinson
Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). To determine whether a statute is "relevantly
similar" to its historical analogue, the Supreme Court instructed courts to look, at a
minimum, to "how and why the regulations burden" the right. *Id.* at 2132-33. The
analogues must further be "well established and representative," as outliers do not
reflect what was a well-established understanding and are not representative of the
Nation's tradition. *See id.* at 2133, 2153.

The historical analysis required by *Bruen* focuses on identifying the public
understanding of the Second Amendment right at the time it was adopted. *Id.* at 2136.
Ancient precedent that "long predates" the adoption of the Second Amendment "may
not illuminate the scope of the right if linguistic or legal conventions changed in the
intervening years." *Id.* And while historical examples from the post-enactment period
may help illuminate the scope of the Second Amendment right to a degree, a post-

14

enactment example may not be determinative on its own. *Id.* Specifically, post-enactment history that reflects an "open, widespread, and unchallenged" type of regulation that dates to the "early days of the Republic" may help understand the original scope of the Second Amendment right. *Id.* at 2136-37 (citation omitted). On the other hand, if a post-enactment regulation conflicts with the Second Amendment's plain text, "the text controls." *Id.* at 2137.

**B.     Prior Cases Upholding Section 922(g)(1) Do Not Control This Matter**

Pre-*Bruen* precedents from the D.C. Circuit upholding Section 922(g)(1), namely *Schrader*, 704 F.3d 980, and *Medina*, 913 F.3d 152, are not controlling. The reasoning underlying those cases has been undermined by *Bruen*, and therefore those cases have been abrogated. In particular, the *Schrader* court's ruling against a categorical challenge to Section 922(g)(1) was premised on the means-end analysis that the Supreme Court expressly rejected in *Bruen*. *Compare Schrader*, 704 F.3d at 293, *with Bruen*, 142 S. Ct. at 2127. Similarly, *Medina* built off *Schrader* to reject an as-applied challenge by a non-violent felon on the grounds that a felony conviction removes a person from the "law-abiding" class "entitled to bear arms" and the plaintiff in that case failed to establish otherwise, in contrast with *Bruen*'s unambiguous instruction that Second Amendment analyses must start with a person's "conduct" then turn to whether the *Government* has met *its* burden. *Compare Medina*, 913 F.3d at 160-61, *with Bruen*, 142 S. Ct. at 2129-30. Because neither case accords with *Bruen*, courts within this district must re-assess, in the first instance, whether Section 922(g)(1) is constitutional under the Second Amendment according to *Bruen*'s analytical rubric.

In *Schrader*, the D.C. Circuit considered a facial challenge to Section 922(g)(1) by a sixty-four-year-old Vietnam veteran who, in 1968, when he was twenty and serving in the United States Navy, had been involved in an altercation with a "street gang" in Annapolis, Maryland. *See* 704 F.3d at 287. The altercation resulted in the plaintiff's conviction of common law misdemeanor assault and battery under Maryland law. *Id.* At the time, Maryland law had no maximum statutory penalty for this charge. *Id.* The plaintiff served no time in jail, and paid a $100 fine. *Id.* Apart from a traffic violation, the plaintiff never had another encounter with law enforcement. *Id.* However, when attempting to acquire firearms for self-defense in 2008, the FBI's National Instant Criminal Background Check system ("NICS") denied his transactions on the grounds that he was ineligible under Section 922(g)(1) because the common law assault and battery offense could have been punished by imprisonment exceeding the threshold in Section 922(g)(1), given that Maryland law did not proscribe a maximum sentence. *Id.* The veteran sued the Attorney General and the Federal Bureau of Investigation, raising statutory and constitutional challenges to Section 922(g)(1). *Id.* at 287-88.

The court rejected the plaintiff's constitutional claim because it determined that the statute "passe[d] muster under the appropriate level of constitutional scrutiny" under a "two-step approach." *Id.* at 292-93. Thus, from the beginning, the court applied an analysis rejected in *Bruen*. *See* 142 S. Ct. at 2127 (rejecting this two-step approach). The court applied intermediate scrutiny because Section 922(g)(1)'s "severe" burden only falls on "individuals who cannot be said to be exercising the core of the Second Amendment right" of "law-abiding, responsible citizens to use

16

arms in defense of hearth and home." *Schrader*, 704 F.3d at 293 (quoting *Heller*, 554 U.S. at 635). The court's rationale for selecting intermediate scrutiny is thus also contrary to *Bruen*, which defines the appropriate test in terms of the relevant "conduct," not a person's status as law-abiding. *See* 142 S. Ct. at 2129-30. The *Schrader* court then reasoned that Section 922(g)(1) has an "important" objective and the Government had shown a "substantial relationship" between that objective and the statute. *See* 704 F.3d at 293-94. At no point did the *Schrader* court address whether Section 922(g)(1) fit within the Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2129-30.

In *Medina*, the D.C. Circuit rejected an as-applied challenge to Section 922(g)(1) brought by an individual convicted of felony bank fraud nearly three decades prior, for which he was sentenced to three years of probation, sixty days of home detention, and a fine. *See* 913 F.3d at 154. The plaintiff argued that the non-violent nature of his conviction, his years of good behavior following the conviction, and the absence of any indication that he poses a heightened risk of violent conduct made the statute unconstitutional as applied to him. *Id.* at 157.

Unlike the *Schrader* court, the *Medina* court conducted a historical analysis. *Id.* at 158. However, the *Medina* court's analysis was flawed from the outset because it examined whether the plaintiff was "within the scope" of the Second Amendment. *Id.* at 157-58. The approach in *Medina* runs headlong into *Bruen*'s command that the focus be on the "conduct" at issue, 142 S. Ct. at 2129-30, as well as *Heller*'s definition of "the people" as used in the Constitution, including the Second Amendment, 554

U.S. at 580; *see also Rowson*, 2023 WL 431037, at *17; *Banuelos*, 2022 WL 17752205, at *3.

From this flawed premise, the *Medina* court's historical analysis proceeded by addressing the wrong question. *See* 913 F.3d at 158-60. First, the *Medina* court stated that, because capital punishment and estate forfeiture was an available penalty for founding-era penalties (while acknowledging, in passing, that the penalties for felonies became less severe in the immediate years following independence), it was "difficult to conclude" that the public of that time would view felons as "within the scope of those entitled to possess arms." *Id.* at 158. This illogical leap is flawed for at least two reasons. First, as explained above, the focus on whether felons are "within the scope" of the Second Amendment is wrong under *Bruen* and *Heller*. *See Bruen*, 142 S. Ct. at 2129-30; *Heller*, 554 U.S. at 580. Second, there is no evidence that the founding generation enacted legislation disarming convicted felons who were *not* subject to execution or estate forfeiture, *see generally* Winkler, *supra*, at 1563; Marshall, *supra*, at 708, even as felony penalties became more lax and forfeiture "virtually disappeared" as a penalty in the early years of the Republic, *Medina*, 913 F.3d at 158. As the Supreme Court explained in *Bruen*, where there is not a "distinctly similar historical regulation" that addresses an issue that existed in the 18th century, such as the ability of felons to keep and bear arms, the absence of such law is "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Next, the *Medina* court considered a 1787 proposal before the Pennsylvania ratifying convention that would have prohibited the enactment of laws "unless for

18

crimes committed, or real danger of public injury from individuals." 913 F.3d at 158 (emphasis omitted) (citation omitted). But an unadopted proposal is not evidence of a widely held understanding of a right. *See Rahimi*, 61 F.4th at 457. Indeed, this proposal never became part of the Second Amendment, and as a never-enacted proposal, cannot contradict the Amendment's text or serve as a historical analogue for Section 922(g)(1). *Cf. id.* (citing *Bruen*, 142 S. Ct. at 2137).

The *Medina* court then looked to revolutionary-period laws in Massachusetts and Pennsylvania that confiscated arms of persons "who would not swear loyalty to the United States." 913 F.3d at 159. But these "loyalty oath" laws say nothing about whether felons may be disarmed. The Supreme Court explained that, when reasoning by historical analogy, courts must consider, among other things, "*why* the regulations burden" the right. *Bruen*, 142 S. Ct. at 2132-33 (emphasis added). In the case of loyalty oath laws, the purpose was "the preservation of political and social order," not the disarmament of people because of past criminal conduct or a generalized risk of future violence. *Cf. Rahimi*, 61 F.4th at 457. In addition, it seems that a convicted felon who *did swear* loyalty to the United States could continue to keep and bear firearms under these laws. The loyalty oath laws therefore offer no analogy to Section 922(g)(1).

The *Medina* court next cited to other circuit courts which had adopted the so-called "virtuous citizen" theory, which posits that the right to bear arms does not extend to "unvirtuous citizens." 913 F.3d at 159. The *Medina* court did "*not accept this theory outright*," but instead merely noted that the support in other circuits was "persuasive evidence that the scope of the Second Amendment" excluded "more than

19

just individually identifiable dangerous individuals." *Id.* (emphasis added). As explained in more detail below, the "virtuous citizen" theory is inconsistent with *Heller* and *Bruen* because, among other things, it lacks any limiting principle and threatens to swallow the Second Amendment whole. *See, e.g.*, *Rahimi*, 61 F.4th at 453. But in any event, the D.C. Circuit declined to expressly adopt this erroneous theory, so it does not control this case. *Cf. Medina*, 913 F.3d at 159.

Finally, the *Medina* court considered the dicta in *Heller* that described felon-in-possession laws as "longstanding" and "presumably lawful." *Id.* (quoting *Heller*, 554 U.S. at 626, 627 n.26, 635). But in actuality, laws prohibiting felons from possessing firearms are not-so-longstanding. There is no evidence of founding-era regulations prohibiting felons from possessing firearms. *See* Winkler, *supra*, at 1563. At the federal level, there was no law prohibiting felons from possessing firearms until 1938, nearly a century and a half after the states ratified the Second Amendment. *See Skoien*, 614 F.3d at 640. Laws prohibiting felons from possessing firearms did not begin to appear at the state level until after World War I. *See* Marshall, *supra*, at 708. Thus, even the oldest felon in possession laws are less-longstanding than the regulations that the Supreme Court held unconstitutional in *Bruen*. 142 S. Ct. at 2122. The Supreme Court acknowledged in *Heller* that it did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" in that case. 554 U.S. at 626. Therefore, this dicta should not be treated as if it were a holding of the Supreme Court. At most, the statement is a caveat that expresses the extent of its holding *in that case*. But this "presumption" does not hold up when felon-in-possession laws are scrutinized under *Bruen*'s historical analysis test.

Because the analysis underlying both *Schrader* and *Medina* was gutted by the Supreme Court's opinion in *Bruen*, neither case is controlling in this matter. This Court should therefore analyze the constitutionality of Section 922(g)(1), in the first instance, according to the standard set forth in *Bruen*.

**C.    The Conduct Prohibited by Section 922(g)(1) is Plainly Covered by the Second Amendment**

The conduct that Section 922(g)(1) attempts to prohibit, namely the possession of a firearm in or affecting interstate commerce while being a convicted felon, is squarely covered by the plain text of the Second Amendment. It is beyond reasonable dispute that possessing a commonly owned firearm, such as a handgun, on one's person constitutes keeping or bearing arms, as those terms are used in the Second Amendment. The handgun, as "the most popular weapon chosen by Americans for self-defense," is certainly a firearm "in common use at the time." *See Heller*, 554 U.S. at 627, 629. To "keep" firearms within the meaning of the Second Amendment is simply to "have weapons." *Id.* at 582. And possessing a firearm, as Mr. Byrd is alleged to have done, fits within the plain meaning of the term "bear." *Id.* at 584 (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)). Therefore, the conduct prohibited by Section 922(g)(1), and allegedly engaged in by Mr. Byrd, is "presumptively" protected by the Second Amendment under the first part of the *Bruen* test. 142 S. Ct. at 2129-30. The burden is on the Government to overcome this presumption. *Id.*

The Government may try to argue that the Second Amendment does not apply to those who it decides are not "virtuous" citizens, reasoning that such people are not part of "the people" for Second Amendment purposes. *See, e.g.*, *Medina*, 913 F.3d at

159-60; *Rahimi*, 61 F.4th at 451. The theory derives from a "classical republican political philosophy" which posits that the Government has the authority to disarm "the unvirtuous (i.e. criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." *Medina*, 913 F.3d at 159 (citation omitted). For support, the Government may overstress *Heller*'s language describing the Second Amendment right of "law-abiding citizens," 554 U.S. at 625, 635, as somehow limiting the scope of the Second Amendment to only those people the Government deems "virtuous" and "law-abiding." But misconstruing this language to limit the meaning of "the people," apparently for Second Amendment purposes only, would either mean that convicted felons are also excluded from "the people" protected by the First and Fourth Amendment, or that the term "the people" means something different in the Second Amendment than where that term is used elsewhere in the Constitution. The first possibility is contrary to settled law. *See Rowson*, 2023 WL 431037, at *18 ("It is black letter law that even convicted felons retain rights under, *inter alia*, the First and Fourth Amendments." (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979))). The second possibility is contradicted by *Bruen*'s unambiguous admonition that the Second Amendment must be treated the same as the other guarantees in the Bill of Rights, *Bruen*, 142 S. Ct. at 2156, and runs against the presumption of consistent usage of the term "the people" in the Constitution, *cf. Heller*, 554 U.S. at 580; *Rahimi*, 61 F.4th at 451; *Rowson*, 2023 WL 431037, at *17; *Carrero*, 2022 WL 9348792, at *2. The Supreme Court in *Heller* stated that the term "the people," as used in the Second Amendment and throughout the Constitution, "unambiguously refers to *all members* of the political community, *not an unspecified subset*." 554 U.S. at 580

(emphasis added). So just as felons are part of "the people" protected by the First and Fourth Amendments, *Rowson*, 2023 WL 431037, at *18, felons must also be members of "the people" protected by the Second Amendment, *see, e.g.*, *Rahimi*, 61 F.4th at 451; *Rowson*, 2023 WL 431037, at *17; *Banuelos*, 2022 WL 17752205, at *3; *Carrero*, 2022 WL 9348792, at *2. To hold otherwise would be to treat the Second Amendment as "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," in direct violation of the Supreme Court's instruction to the contrary in *Bruen*. 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality opinion)). The Supreme Court's use of the term "law-abiding" in *Heller* only serves to delimit the scope of its holding *in that case*, which did not purport to address felon-in-possession laws. *See Heller*, 554 U.S. at 626-27; *accord Rahimi*, 61 F.4th at 452.

Furthermore, the "virtuous citizen" theory takes an anomalous approach to interpreting the scope of a right. In her dissent in *Kanter v. Barr*, then-Judge Barrett explained the distinction between the two approaches to firearm disarmament laws. The first approach, which the dissent disapproved of, holds "that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope." *Id.* at 451; *see also Range v. Att'y Gen. United States*, 53 F.4th 262, 271-73 (3d Cir. 2022) (per curiam), *vacated*, 56 F.4th 992 (3d Cir. 2023). The "better" approach, on the other hand "maintain[s] that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The former approach deviates from other contexts, where the deprivation of a right "occurs

because of state action." *Id.* at 452-53. In addition, the former approach conflicts with

both *Heller*, *see id.* at 453, and *Bruen*, which places the burden on the Government to

justify its actions are in accordance with the Nation's historical tradition of firearm

regulation when depriving a person of the right protected by the Second Amendment,

*cf.* 142 S. Ct. at 2129-30.

      The "virtuous citizen" theory would also swallow the Second Amendment

whole by affording the Government unchecked authority to define the scope of who is

"virtuous" or "law-abiding." The Government's power to strip people of their Second

Amendment rights, under this theory, could conceivably extend to any group

imaginable. *See, e.g.*, *Rahimi*, 61 F.4th at 453. "Under the Government's reading,

Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding' people—

however expediently defined—from the scope of the Second Amendment. Could

speeders be stripped of their right to keep and bear arms? Political nonconformists?

People who do not recycle or drive an electric vehicle?" *Id.* It is thus unclear how

minor of an infraction would be sufficient, in the Government's view, to strip a person

of their rights. The absence of a limiting principle is fatal to this theory.

      Further, the *Heller* Court's dicta that its holding did not "cast doubt on

longstanding prohibitions on the possession of firearms by felons" and that such a

prohibition was "presumptively lawful" does not control the outcome here either. *See*

554 U.S. at 626-27, n.26.  The Supreme Court "explicitly deferred analysis" of the

constitutionality of felon-in-possession laws, so this dicta does not equate to a holding

on the constitutionality of Section 922(g)(1). *See generally Kanter*, 919 F.3d at 453-54

(Barrett, J., dissenting) ("[D]oes 'presumptively lawful' mean that such regulations

are presumed lawful unless a historical study shows otherwise? . . . Does the word

'longstanding' mean that prohibitions of recent vintage are suspect? . . . *Heller*'s

dictum does not settle the question before us."). And as explained above, this

statement is not consistent with the history relevant to Second Amendment analysis in

any event.

For these reasons, the conduct prohibited by Section 922(g)(1) is covered by

the plain text of the Second Amendment. The burden is on the Government to prove

that Section 922(g)(1) is permissible in accordance with the Nation's historical

tradition of firearm regulation.

**D.     The Government Cannot Establish a Historical Tradition of Disarming**

**Felons**

Under *Bruen*, the Government bears the burden of "demonstrating that [Section

922(g)(1)] is consistent with the Nation's historical tradition of firearm regulation."

142 S. Ct. at 2130. The Government will not be able to meet this burden.

Even in dissent in *Bruen*, Justice Breyer specifically referenced the relative

recent "historical pedigree" of §922(g):

> The Court disregards "20th-century historical evidence." *Ante,* at
> 2154, n. 28. But it is worth noting that the law the Court strikes
> down today is well over 100 years old, having been enacted in
> 1911 and amended to substantially its present form in 1913.
> See *supra,* at 2169. That alone gives it a longer historical pedigree
> than at least three of the four types of firearms regulations
> that *Heller* identified as "presumptively lawful." 554 U.S. at 626–
> 627, and n. 26, 128 S.Ct. 2783 ; see C. Larson, Four Exceptions
> in Search of a Theory: *District of Columbia v. Heller* and
> Judicial *Ipse Dixit* , 60 Hastings L. J. 1371, 1374–1379 (2009)
> (concluding that " 'prohibitions on the possession of firearms by
> felons and the mentally ill [and] laws imposing conditions and
> qualifications on the commercial sale of arms' " have their origins

> in the 20th century); *Kanter v. Barr* , 919 F.3d 437, 451 (CA7
> 2019) (Barrett, J., dissenting) ("Founding-era legislatures did not
> strip felons of the right to bear arms simply because of their status
> as felons"). Like Justice KAVANAUGH, I understand the Court's
> opinion today to cast no doubt on that aspect of *Heller* 's
> holding. *Ante,* at 2122 - 2123 (concurring opinion). But unlike
> Justice KAVANAUGH, I find the disconnect between *Heller* 's
> treatment of laws prohibiting, for example, firearms possession
> by felons or the mentally ill, and the Court's treatment of New
> York's licensing regime, hard to square. The inconsistency
> suggests that the Court today takes either an unnecessarily
> cramped view of the relevant historical record or a needlessly
> rigid approach to analogical reasoning.

*Bruen*, 142 S. Ct. at 2184 (Breyer J., dissenting). Notably, the majority opinion voiced

no disagreement with this characterization of the recency of the felon-in-possession

laws.

### 1.  There Is No Evidence of Founding-Era Regulations Disarming Felons

First and foremost, as explained above, there is no evidence that the founding

generation prohibited felons from possessing firearms. Winkler, *supra,* at 1563;

Marshall, *supra*, at 708. The absence of a "distinctly similar historical regulation"

addressing an issue that existed at the time of the founding, such as the dispossession

of felons' firearms, is "relevant evidence" that Section 922(g)(1) "is inconsistent with

the Second Amendment." *Bruen*, 142 S. Ct. at 2131.[1]

---

[1] Although felons were subject to capital punishment or estate forfeiture for their crimes during the founding era, *Medina*, 913 F.3d at 158 (citing 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *95 (Harper ed. 1854)), these penalties were not necessarily imposed in every case for every felony, particularly in the years immediately following the Founding, *id.* ("[P]enalties for many felony crimes quickly became less severe in the decades following American independence and, by 1820, forfeiture had virtually disappeared in the United States." (internal quotation marks omitted)). So this relevant evidence (the absence of founding-era felon firearms dispossession laws) is not negated by the availability of capital punishment for felonies at the time.

As noted above, there was a 1787 proposal before the Pennsylvania ratifying convention that would have prohibited the enactment of laws dispossessing people of firearms "unless for crimes committed, or real danger of public injury from individuals." *Medina*, 913 F.3d at 158 (emphasis omitted) (quoting another source). However, this proposal was not adopted, and therefore does not prove the existence of a widely held understanding that such laws were consistent with the right codified in the Second Amendment. *See Rahimi*, 61 F.4th at 457. In fact, it indicates that just the opposite was true.

Far from prohibiting felons from possessing firearms, militia statutes from the founding era arguably *required* felons to possess firearms. "[A]lthough the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-cv-1245, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022). The second Militia Act of 1792 (enacted the year following the Second Amendment) required "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years" to be enrolled in the militia. Act of May 8, 1792, § 1, 1 Stat. 271. Every citizen enrolled in the militia was required under this law to "provide himself with a good musket or firelock," among other equipment, within six months. *Id.* Although the statute exempted certain classes of government officials from service, felons were not among the groups expressly excluded from the militia. *Id.* § 2, 1 Stat. 272. While the statute provided that persons exempted from militia service by state law, the burden, according to *Bruen*, is on the Government to identify any such laws.

In the absence of any such examples, it would appear that, far from being subject to disarmament, felons who had satisfied their sentences may have been *required by law* to keep and bear arms. If the founders believed that the Government retained the power to disarm people based on past criminal conduct, one would expect felons to have been excluded from the militia and the requirement to keep and bear arms.

### 2. There Are No Founding-Era Historical Analogues for Section 922(g)(1)

The Government is therefore left only with argument by historical analogy. But none of the laws that the Government will likely identify are "relevantly similar" to Section 922(g)(1) because they differ substantially from the modern felon-in-possession statute in either why or how (or both) they restricted the right to bear arms. *Cf. Bruen*, 142 S. Ct. at 2132-33.

The Government may cite to founding-era laws in the colonies that provided for the confiscation of firearms belonging to (1) people who would not take a loyalty oath, (2) slaves, and (3) Native Americans and other racial minorities. *See generally Rahimi*, 61 F.4th at 457; Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004) (citing Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31; Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157-60 (2007); Winkler, *supra*, at 1562 (noting that the founding generation imposed "complete bans on gun ownership by free blacks, slaves, Native Americans, and those of mixed race"). The Government has cited to many of these laws in other cases to support the general proposition that it

28

has the power to disarm any group of people it determines to be "dangerous." *See,*
*e.g.*, *Rahimi*, 61 F.4th at 457. But these laws are not analogous to Section 922(g)(1).
As explained above, these laws were not targeted towards addressing violent crime in
general, but instead appear purposed "to prevent armed rebellions" by specific groups
who were "thought to pose a threat to the security of the state." *Cf. Rahimi*, 61 F.4th at
457. To the contrary, Section 922(g)(1)'s predecessor was enacted in response to
organized crime, then expanded to cover all felons in 1961 to address rising crime in
general, but also racketeering in particular. *Banuelos*, 2022 WL 17752205, at *4.
Because the reason *why* these founding-era laws disarmed people differs from the
reason Section 922(g)(1) was enacted, they are dissimilar and therefore do not support
any argument that Section 922(g)(1) is part of a historical tradition of firearm
regulation. *See Rahimi*, 61 F.4th at 457; *see also Bruen*, 142 S. Ct. at 2133. Further,
laws disarming slaves, Native Americans, and those perceived as disloyal targeted
people who were arguably not part of "the people" at the time, *Rahimi*, 61 F.4th at
457, unlike felons. To the extent that these laws are examples of the Government's
power to disarm people who were *not* entitled to the right protected by the Second
Amendment at the time they were enacted, they are of no relevance here. These
statutes do nothing to help the Government meet its burden.

The Government may also attempt to rely on pre-revolutionary laws
prohibiting "going armed to terrify the King's subjects" as evidence of its authority to
disarm the people. *Rahimi*, 61 F.4th at 457 (quoting *Bruen*, 142 S. Ct. at 2141). But
this attempted analogy also falls short of satisfying the Government's burden for
several reasons. First, the Supreme Court cast doubt on whether these laws are

"reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms." *Id.* at 458 (citing *Bruen*, 142 S. Ct. at 2142). This is because, of the four examples the Government has previously relied upon, one never provided for firearm forfeiture, two dropped the forfeiture penalty "fairly early on," leaving only one example, which "is not enough 'to show a tradition of public carry regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2142). Further, these laws only covered carrying arms in a way that struck "fear" or "terror" in the people. *Bruen*, 142 S. Ct. at 2144-45. Merely carrying a firearm in public was not enough to result in an offence. *Id.* at 2145. The focus of these laws was the *manner* in which arms are carried, and not the *status* or *criminal history* of the person carrying them. *Cf. id.* at 2150. The "going armed" laws are therefore not a useful analogy with which to assess the constitutionality of Section 922(g)(1).

Finally, the Government may point to surety statutes as evidence of its power to disarm. However, these laws are not adequate analogues for Section 922(g)(1) either. First, surety laws functioned differently than Section 922(g)(1) because they provided a mechanism by which an individual, having specific fear that another individual would do him harm, could "demand surety of the peace against such person" through a civil proceeding where there was "probable suspicion" that a crime would be committed *against him* in the *future*. *See Rahimi*, 61 F.4th at 459 (quoting 4 William Blackstone, Commentaries on the Laws of England 249, 252 (1769)). While the subject of a surety action was "forbidden from carrying a weapon in public absent special need" if he failed to post the surety, there was no prohibition on possessing or carrying arms if the subject posted the surety (or could demonstrate a

special need). *Id.* at 459-60. By contrast, Section 922(g)(1) functions as a total deprivation of the right to keep and bear arms based upon a prior offense for which the person has already been prosecuted and punished. Therefore, the partial, conditional burden that surety laws imposed on the right to bear arms is not "comparable" to the total ban instituted by Section 922(g)(1). *Cf. id.* at 460.

In sum, none of the laws the Government will likely rely on are relevantly similar to Section 922(g)(1). At best, these laws support that the Government has the power to disarm groups deemed to threaten rebellion or violent insurrection, those who carry arms in a particularly menacing manner, and those who are proven to pose an individualized risk of future misconduct in a civil proceeding. But none of these examples support what is, in effect, a lifetime ban on firearm possession because of a past conviction. The Government will therefore be unable to establish that felon-in-possession laws are consistent with the Nation's historical tradition of firearms regulation.

## I.      CONCLUSION

For the foregoing reasons, Section 922(g)(1) is unconstitutional. This Court should grant Mr. Byrd's motion to dismiss the indictment.


Respectfully submitted,

_____/s/_____
A.J. KRAMER
FEDERAL PUBLIC DEFENDER
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
a._j._kramer@fd.org