**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA        )

                v.        )        CR. NO. 22-CR-355 (TNM)

ARTIE BYRD        )

_____ )


## MEMORANDUM IN AID OF SENTENCING


**Gun violence is part of a vicious cycle of race and inequality in the U.S., reflecting existing**

**social inequalities, and also making it even more challenging for young black people,**

**especially young black men, to escape poverty and violence.**

*Richard V. Reeves and Sarah E. Holmes*

*December 15, 2015*

When Artie Byrd was born in 1992, he was living in northwest Washington, D.C. Despite its well-known reputation for being an upper-crust quadrant of D.C., several pockets of northwest were exposed to violence during Artie's early years.[1]  The crack pandemic and the resulting gun violence raged throughout the city in the 1980s and 1990s.  Many people described living in D.C. at that time as living in a war zone with hearing shootings and police sirens on a nightly basis.[2]

The powers that be in Washington, D.C. have studied gun violence for decades.  In February 1999, the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention produced a report titled, "Promising Strategies [t]o Reduce Gun Violence."[3]   One of the main ways to reduce gun violence was through collaborative efforts with community members and the police.

> In particular, citizen participation in crime prevention efforts has been critical to their success and sustainability. Police can do their job more effectively when the community's priorities shape their actions. The subsequent development of trust enhances this partnership and results in greater police-community cooperation and mutual support. These communities have also learned that their efforts must be long-term in order to be effective, and that capacity building in different sectors of the community is needed.[4]

---

[1] Ruben Castaneda, *NIGHT OF VIOLENCE IN D.C. LEAVES 17 WOUNDED, 1 DEAD*, Washington Post, June 20, 1995, available at https://www.washingtonpost.com/archive/local/1995/06/21/night-of-violence-in-dc-leaves-17-wounded-1-dead/960920bc-e120-4d22-9aa8-ee289ecc4973/ (last accessed on Jan. 7, 2024).

[2] Gabriel Escobar, *WASHINGTON AREA'S 703 HOMICIDES IN 1990 SET A RECORD*, Washington Post, Jan. 1, 1991, available at https://www.washingtonpost.com/archive/politics/1991/01/02/washington-areas-703-homicides-in-1990-set-a-record/ee71dd1f-59c8-4f03-af62-05b0a6134365/ (last accessed Feb. 23, 2024).

[3] Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Dep't of Justice, *Promising Strategies [t]o Reduce Gun Violence*, 17, Feb. 1999, available at https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/gun_violence/173950.pdf (last accessed on January 7, 2024).

[4] Id. at 17.

"**A fundamental challenge that many partnerships face in reducing illegal firearm possession, carrying, and use is to convince those who carry guns that they can survive in their neighborhoods without being armed**."[5]  Partnership programs needed "to dispel the perception of many residents that the authorities can neither protect them nor maintain order in their neighborhoods."[6]

For 8-year-old Artie, who had returned to D.C. in 2000, after living in at Atlanta, the collaborative efforts did not appear to have much effect.  His great-grandmother wanted him to return to D.C. after learning that his mother had struggled to provide for him in Atlanta.  But the D.C. he returned to could hardly ensure his basic safety. Living in D.C., he described, "there were always shootings."

At the root of the collaborative efforts laid out by the Department of Justice in 1999, residents needed to trust that the police could protect them.  Trusting the police, however, has not fared well for many Black men, who are more likely than their White counterparts to be treated unfairly and killed by police.  "In a 2019 Center survey, 84% of black adults said that, in dealing with police, blacks are generally treated less fairly than whites; 63% of whites said the same. Similarly, 87% of blacks and 61% of whites said the U.S. criminal justice system treats black people less fairly."[7]  "Nearly two-thirds of black adults (65%) say they've been in situations where people acted as if they were suspicious of them because of their race or ethnicity, while only a quarter of white adults say that's happened to them."[8]  In addition, "[o]n average, police

---

[5] Id. at 17 (emphasis added).
[6] Id. at 17.
[7] Drew Desilver, Michael Lipka, and Dalia Fahmy, *10 Things We Know About Race and Policing in the U.S.*, Pew Research Center, June 3, 2020, available at https://www.pewresearch.org/short-reads/2020/06/03/10-things-we-know-about-race-and-policing-in-the-u-s/ (last accessed on Feb. 15, 2024).
[8] Desilver, *supra* note 7.

in the United States shoot and kill more than 1,000 people every year,"[9]  with Black Americans

are killed at a much higher rate than White Americans, as shown in the graph below.



[9] Washington Post Investigations, *1,138 people have been shot and killed by police in the past 12 months*, Washington Post, Updated Feb. 14, 2024, available at https://www.washingtonpost.com/graphics/investigations/police-shootings-database/ (last accessed on Feb. 15, 2024).

Statistics about Black Americans being shot by the police are not limited to the headlines that have come out of Cleveland,[10] Columbus,[11] Ferguson,[12] Louisville,[13] North Charleston,[14] or Minneapolis.[15]  Police shootings and other forms of aggressive use of power have occurred in Washington, D.C.:

- *D.C. Police Officer Who Shot Man in Car is Charged with Murder*: Sgt. Enis Jevric fatally shot a man who had been unconscious at the wheel of a running car after he woke up and tried to drive away. [16]

- *District releases body-cam video of officer punching man during arrest*[17]

---

[10] Shaila Dewan and Richard A. Oppel, Jr., *In Tamir Rice Case, Many Errors by Cleveland Police, Then a Fatal One*, NY Times, Jan. 22, 20215, available at https://www.nytimes.com/2015/01/23/us/in-tamir-rice-shooting-in-cleveland-many-errors-by-police-then-a-fatal-one.html (last accessed on Feb. 13, 2024).
[11] Meredith Deliso, *Andre Hill shot 4 times by former Columbus police officer, autopsy reports hows*, ABC News, March 27, 2021, available at https://abcnews.go.com/US/andre-hill-shot-times-columbus-police-officer-autopsy/story?id=76724709 (last accessed on Feb. 21, 2024).
[12] This Day in History, August 9, 2014, Michael Brown is killed by a police officer in Ferguson, Missouri, available at https://www.history.com/this-day-in-history/michael-brown-killed-by-police-ferguson-mo (last accessed on Feb. 13, 2024).
[13] Theresa Waldrop, Eliott C. McLaughlin, Sonia Moghe and Hannah Rabinowitz, *Breonna Taylor killing: A timeline of the police raid and its aftermath*, Aug. 4, 2022, available at https://www.cnn.com/2022/08/04/us/no-knock-raid-breonna-taylor-timeline/index.html (last accessed on Feb. 12, 2024).
[14] Office of Public Affairs, U.S. DOJ, *Former North Charleston, South Carolina, Police Officer Michael Slager Sentenced to 20 Years in Prison for Federal Civil Rights Offense*, Dec. 7, 2017, available at https://www.nytimes.com/2017/06/20/us/police-shooting-castile-trial-video.html (last accessed on Feb. 13, 2024).
[15] Office of Public Affairs, U.S. DOJ, *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd*, Feb. 24, 2022, available at https://www.justice.gov/opa/pr/three-former-minneapolis-police-officers-convicted-federal-civil-rights-violations-death (last accessed on Feb. 12, 2024).
[16] Mike Ives, *D.C. Police Officer Who Shot Man in Car is Charged with Murder*, NY Times, March 8, 2023, available at https://www.nytimes.com/2023/03/08/us/dc-officer-shooting-murder-charges.html (last accessed on Feb. 13, 2024).
[17] Clarence Williams and Ellie Silverman, *District releases body-cam video of officer punching man during arrest*, Washington Post, Aug. 18, 2021, available at https://www.washingtonpost.com/local/public-safety/bocy-cam-video-dc-police-punch-man/2021/08/18/cb939644-0073-11ec-ba7e-2cf966e88e93_story.html (last accessed on Feb. 13, 2024).

- *D.C. officer guilty of chokeholds in latest U.S. police abuse prosecution*: Mark L. Clark is the 10th law enforcement or corrections officer indicted or convicted since 2022 of excessive force, abuse or homicide charges in D.C. [18]

As a result, individuals follow a natural instinct to protect themselves.  Survival and the desire to protect oneself is human.  According to the Pew Research Center, "[p]ersonal protection tops the list of reasons gun owners give for owning a firearm."[19]  This is the same reason why individuals in high-crime urban areas possess guns.  "[I]n-depth interviews with 357 young Black men aged 15-24" by the Center for Justice Research at Texas Southern University revealed that "[o]f the two-thirds of respondents who reported owning a firearm, the majority noted that they did so for safety. About half of gun owners said they carried a gun all the time. Only two respondents reported having a license to own a gun."[20]  Carrying a firearm for protection is especially true for individuals, like Artie, who have seen a lot of violence and have been shot before.  As Artie stated in his PSR interview, "**you worry about where you go**."

Even with efforts to make a community safe, the natural instinct to protect oneself is paramount, despite police efforts to retrieve guns in the community, according to Joseph B. Richardson, Jr., lead Epidemiologist for the Center for Injury Prevention and Policy at the University of Maryland R Adams Cowley Shock Trauma Center.

---

[18] Spencer S. Hsu, *D.C. officer guilty of chokeholds in latest U.S. police abuse prosecution*, Washington Post, May 23, 2023, available at https://www.washingtonpost.com/dc-md-va/2023/05/23/dc-officer-chokehold-conviction/ (last accessed on Feb. 13, 2024).

[19] Katherine Schaeffer, *Key facts about Americans and guns*, Pew Research Center, Sept. 13, 2023, available at https://www.pewresearch.org/short-reads/2023/09/13/key-facts-about-americans-and-guns/ (last accessed on Jan. 7, 2023).

[20] Dr. Dorothy Dillard, Amy Goldstein, Dr. Howard Henderson, Dr. Maurice Mangum, and Dr. Johnny Rice II, *Policy Brief: Learning from Lived Experiences to Identify Gun Violence Solutions*, 2023, available at https://assets-global.website-files.com/5ef1f236f51b5952605aec63/655d448c6f47dce092836eff_Policy%20Brief_124847_Gun-Violence-Whitepaper_Superside_V2_V1.pdf, page 10.

> To be quite honest, gun retrieval units and gun trace units, as we've seen in Baltimore and Washington, D.C., have often violated the rights of many Black and brown citizens, so people have a significant distrust (of) the police department. **In turn, many people are deciding to engage in protecting themselves and not relying on police.**[21]

The gun violence pandemic in D.C. does not fall on Mr. Byrd's shoulders.  He is not responsible for any shootings.  He has not imported guns or sold guns to others in D.C.  He has not advocated for others to arm themselves.  Hence, this Court should resist any tropes and stereotypes of violent black men in the District in sentencing Mr. Byrd, who has sought only to to protect himself, an instinct that is no different than the natural inclination of any other American.  Mr. Byrd is not a violent or dangerous individual who needs to be severely punished for following this instinct.  Therefore, the Court should reject the government's sentencing recommendation and sentence Mr. Byrd below the applicable guidelines.

### Sentencing Law

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[22]  Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[23]  Judge Frankel called for a "Commission

---

[21] The Crime Report Staff, *Black Gunshot Survivors Face 'Trauma Recidivism,'* May 2, 2022, available at https://thecrimereport.org/2022/05/02/the-repeating-trauma-of-black-gunshot-survivors/ (emphasis added) (last accessed on Jan. 7, 2024).
[22] Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).
[23] *Id.* at 228.

on Sentencing" and the enactment of laws to make guidelines that would be "binding" on

federal judges. [24]  Congress answered Judge Frankel's call and in 1984 the Sentencing

Commission was born.  For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended in 2005, when the Supreme Court held that "the

Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively **advisory.**"[25]

Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those

Guidelines and take them into account when sentencing."[26]   While holding that district courts

should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme

Court in *Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18

U.S.C. § 3553(a).

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of

the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the
law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with the needed educational and vocational
training, medical care, or other correctional treatment in the most
effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of
defendant as set forth in the guidelines— (i)issued by the Sentencing
Commission pursuant to section 994(a)(1) of title 28, United States Code,

---

[24] *Id.* at 228.
[25] *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added)
[26] *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).

subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'"[27] to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation."[28]  In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth.[29]

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.**[30]

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "**sufficient, but not greater than necessary**, to comply with the purposes [of

---

[27] *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)).
[28] *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).
[29] 18 U.S.C. § 3661.
[30] 18 U.S.C. § 3582(a) (emphasis added).

sentencing].”[31]

## Argument

### I.     The Nature and Circumstances of the Offense

The Court is well-aware of the nature and circumstances of the offense since this case was tried twice.  The first trial resulted in a hung jury, where the majority of jurors were not convinced that Mr. Byrd possessed the gun despite the DNA evidence.  The jurors had reasonable doubt about possession because the fingerprint evidence was not presented.  During the second trial, the fingerprint evidence showed that the prints were not suitable for comparison.

### II.     Mr. Byrd's History and Characteristics

Artie Byrd began his life in D.C., and from the ages of 3 to approximately 7 years old he lived in Atlanta with his mother.  He vaguely recalls that when she had two additional children, she sent him to live with his grandmother in Atlanta, which he did for one year.  Then, when he turned 8 years old, Mr. Byrd returned to D.C. at the request of his great-grandmother.

In 2021, his great-grandmother described that Artie began misbehaving when he was 15 years old.  He was attempting to "fit in" with others and he was "easily influenced" because he was "fending for himself."  (PSR ¶ 48).  Notably, this is the age when he began using marijuana and when he tried cocaine, which he did not use again.  He was living with different relatives and his father had not be present in his life because he had other children "which put a strain on his responsibility to be a parent" Artie.  "[C]hildren growing up in households without the involvement of both biological parents are at greater risk for negative developmental and well-being outcomes than their counterparts who grow up in households in which both biological

---

[31] *Id.* § 3553(a) (emphasis added).

parents are involved."[32]   Hence, it is no surprise that young Artie focused on "fitting in" with others.

Mr. Byrd's priors reflect his associations with the wrong crowd.  On November 29, 2012, when Artie was 20 years old, he was arrested for and later convicted of unlawful possession of a firearm.  In that case, a person called the police providing a description of a man in the alley with a gun.  Artie's co-defendant fit the description. When the police approached, both ran.  Artie was charged with possession of a gun found in the pocket of his jacket.  His co-defendant was also charged with possession of a firearm found in his pocket of his jacket, as well.   He was sentenced to 42 months of prison and released in 2016.  His post-incarceration supervision terminated successfully in 2019.

On October 27, 2017, Artie Byrd was shot randomly when he was walking in his girlfriend's neighborhood.  He stopped to speak with another person and people started shooting. A bullet pierced his right leg.  He was treated at Howard University Hospital.  This impacted him in many ways.   He stated that "I am never trying to get shot again."  As he stated to the Probation Officer during the PSR interview, "D.C. is f*ed up right now… I [am never] trying to get shot again.  You [I] have to think about where you go, and worry about where you go." When discussing his upbringing with undersigned counsel, Mr. Byrd described his neighborhood as a violent one -- "Shooting were everywhere; whenever outside you'd hear shootings."  Not much has changed.  Shootings are still everywhere, and it remains difficult to trust the police to protect oneself.

---

[32] Jennifer A. Ray, Jeong-Kyun Choi, and Aurora P. Jackson, *Adverse childhood experiences and behavior problems among poor Black children: Nonresident father involvement and single mothers' parenting stress*, Child Abuse & Neglect, Vol. 121, Nov. 2021, 105264, available at https://www.sciencedirect.com/science/article/pii/S0145213421003379#bbb0075

Following the natural instinct to protect himself, Mr. Byrd obtained a firearm for protection and on March 26, 2021, he was convicted of unlawful possession of a firearm.  He had been standing with a group of men and an officer approached and could see an L-shaped object, building from the right from pocket of his jacket.  He pled guilty and was sentenced to 18 months of prison.

On or about April 23, 2022, Mr. Byrd's best friend, who was supposed to pick him up from the Bureau of Prisons and get him clothes before he entered the halfway house, was shot and killed in D.C.  He was like a brother to Mr. Byrd, putting money on his commissary and preparing to help him reenter society upon his release.  Understandably, Mr. Byrd feared that he himself could again be the victim of gun violence.

Despite his prior convictions for possession of a firearm, Mr. Byrd has never shot another individual.  In fact, for the last decade, Mr. Byrd has had *no violent conduct at all*.  Even in the Superior Court case on which the government relies for its argument that Mr. Byrd is dangerous, he was charged with the lowest charge of Accessory After the Fact to Assault with Intent to Kill.  There was never any evidence that Mr. Byrd possessed a weapon or assaulted anyone.  It is doubtful that Mr. Byrd was even present.  Hence, the acquittal should not be considered in his criminal history.  Furthermore, it is not related to the instant offense in any way.  As Justice Jackson recently opined in *McElrath v. Georgia*:

> Once rendered, **a jury's verdict of acquittal is inviolate**. We have described this principle—"that '[a] verdict of acquittal ... could not be reviewed, on error or otherwise' "—as "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence."  This bright-line rule exists to preserve the jury's "overriding responsibility ... to **stand between the accused and a potentially arbitrary or abusive Government that is in command of the criminal sanction.**"

*McElrath v. Georgia*, No. 22-721, 2024 WL 694921, at *4 (U.S. Feb. 21, 2024) (emphasis

added) (citations omitted).  After losing a weak case against Mr. Byrd because he is innocent of

the offense, it is clear here that the government is using its power to seek an enhanced

punishment in this unrelated case to feed the Court a trope that Mr. Byrd is dangerous.  Mr. Byrd

has never used a firearm against anyone.  His institutional history, where one might expect to see

violent behavior considering the conditions, shows no acts of violence or assault.  His past gun

convictions were about his natural desire to protect himself in the environment he lives.

    One might assume that if a person works hard and does well in school, they can escape a

poor neighborhood.  But that assumption is wrong.  Exposure to violence impacts one's

educational advancement.  "[A]nxiety levels rise and cognitive functioning worsens among

school children following a violent crime within half a mile of their home."[33]  "Research

measuring the direct impact of exposure to violent events (i.e., local homicide) on academic

performance estimates that the effect on cognition is pronounced with reading and language

skills regressed roughly two years, lessening impulse control and the ability to maintain

attention." [34]  Furthermore, "[i]ndividuals who witness violence are also at increased risk for a

variety of mental health issues, which can manifest as post-traumatic stress disorder, depression,

poor academic performance, substance abuse, … these costs weigh largely on the shoulders of

black Americans."[35] For Mr. Byrd, advancing in elementary or secondary school was not his

primary concern, especially considering the absences of his parents.  He lived with his

---

[33] Richard V. Reeves and Sarah E. Holmes, *Guns and race: The different worlds of black and white Americans*, Brookings, Dec. 15, 2015, available at
https://www.brookings.edu/articles/guns-and-race-the-different-worlds-of-black-and-white-americans/ (last accessed Jan. 7, 2024)
[34] Bianca E. Bersani *et al.*, *Thinking About Emerging Adults & Violent Crime*, eajustice.org, 6 (May 2019).
[35] Reeves, et al., Brookins, supra note 33.

grandmother during his formative years, particularly from ages 8 to 14 years old while his mother and father were in and out of his life.  As his great-grandmother reported in 2021, he lived with several family members, while his mother was living in Atlanta.[36]

It bears emphasizing that throughout most of his life, as noted in the PSR, Mr. Byrd lacked parental presence, influence, and guidance. His father "reportedly had other children and which put a strain on his responsibility to be a parent to the defendant."  PSR at 17.  His mother's inability to care for Mr. Byrd caused him to move back to D.C. in the first place. And circa 2019, the situation of Mr. Byrd's mother has taken a turn for the worst, with her whereabouts "unknown."  *Id.*  Per the account of a family acquaintance, "the defendant's mother was living in a tent and 'did not look like herself anymore.'" *Id.* Parental absence has been well-known[37] to contribute to trauma and criminal conduct; the impact of Mr. Byrd's mother's chronic absence and traumatic downturn can only have had a more acutely devastating and indelible impact on Mr. Byrd.

One may assume that obtaining stable employment for a formerly incarcerated individual will be easier once he has his GED and is the way to escape a poor neighborhood.  However, finding solid employment after years of incarceration is extremely difficult, even after attending classes and obtaining a GED.   According to the Prison Policy Initiative, approximately 60% of formerly incarcerated individuals were jobless in 2022 based on a report released by the Bureau

---

[36] Final PSR, Case 21-cr-27, ECF No. 20, pp.14-15.

[37] Demuth, S., & Brown, S. L. (2004). *Family Structure, Family Processes, and Adolescent Delinquency: The Significance of Parental Absence Versus Parental Gender. Journal of Research in Crime and Delinquency*, 41(1), 58-81. https://doi.org/10.1177/0022427803256236; Hoeve, M., Stams, G.J.J.M., van der Put, C.E. et al. *A Meta-analysis of Attachment to Parents and Delinquency*. J Abnorm Child Psychol 40, 771–785 (2012). https://doi.org/10.1007/s10802-011-9608-1 ("Poor attachment to parents was significantly linked to delinquency in boys and girls.").

of Justice Statistics (BJS).[38]  Notably,

> The report shows that of more than 50,000 people released from federal prisons in 2010, a staggering 33% found no employment at all over four years post-release, and at any given time, no more than 40% of the cohort was employed. People who did find jobs struggled, too: Formerly incarcerated people in the sample had an average of 3.4 jobs throughout the four-year study period, suggesting that they were landing jobs that didn't offer security or upward mobility.[39]

The article further explains that "**[f]ormerly incarcerated individuals tend to experience joblessness and poverty that started long before they were ever locked up.**"[40]

> When they're released from prison, the pressure is on to get a job: People on parole (or "supervised release") often must maintain employment or face reincarceration, while struggling to access social services, and trying to make ends meet in a job market more hostile to them than ever before. This combination of pressures amounts to a perpetual punishment.[41]

While Mr. Byrd has been able to obtain employment, a steady lengthy career has not been easy to obtain.  Of course, the racial disparity in employment cannot be ignored:

> Earnings were lowest for Black and Native American people released from federal prison; in fact, racial and ethnic disparities in earnings seemed to grow over time. These findings probably reflect an unfortunate "racialized re-entry" process for people leaving prison, where the stigma of incarceration itself and differences in social networks for job-seekers vary across racial and ethnic groups. Researchers of this concept noted that white people getting out of prison actually appeared more disadvantaged and less employable "on paper" due to higher rates of substance use and longer sentences, but still ended up with better employment and income than Black and Hispanic people leaving prison. [42]

As stated above, the gun violence pandemic in D.C. does not fall on Mr. Byrd's shoulders.  He is not responsible for any shootings.  He has not imported guns or sold guns to

---

[38] Leah Wang and Wanda Bertram, *New data on formerly incarcerated people's employment reveal labor market injustices*, Prison Policy Initiative, Feb. 8, 2022, available at https://www.prisonpolicy.org/blog/2022/02/08/employment/ (last accessed on March 8, 2023).
[39] Id.
[40] Id. (emphasis added).
[41] Id.
[42] Id.

others in D.C.  He has not advocated for others to arm themselves.  As reported, it is a small

number of people in D.C. responsible for gun violence in the city.  According to a report

commissioned by Washington, D.C., "about 500 identifiable people in D.C. drive as much as

70% of the city's gun violence."[43]

> 'In Washington, D.C., most gun violence is very tightly concentrated on a small
> number of very high risk young Black male adults that have a shared set of
> common risk factors,' says David Muhammad, the executive director of the
> National Institute for Criminal Justice Reform. 'This very small number of high
> risk individuals are identifiable. Their violence is predictable and therefore it is
> preventable.'[44]

The study identified that personal disputes and gangs or "group-related conflict" to be the main

sources of gun violence.  None of Mr. Byrd's history shows that he has any gang-affiliation or

has any personal disputes that would result in him shooting or assaulting anyone.  To the

contrary, Mr. Byrd's priors have been connected to his need to protect himself.

There is far more to Mr. Byrd than his criminal history.  He is an easy-going affable

individual.  In 2021, his girlfriend described that Mr. Byrd is a genuine and compassionate

person.  He is known as "Smiley face" because "he's literally always smiling and uplifting the

spirit of others around him,"[45] which is still the case today.  The body-worn camera evidence

showed throughout the trial, that Mr. Byrd is not a threatening individual.  He has always had a

low-key demeanor with a pleasant smile.

His institutional record shows that Mr. Byrd has taken advantage of educational courses.

He obtained his GED at the BOP in 2011.  He worked as a pod orderly, worked in the interior

---

[43] Jenny Gathright, A majority of D.C.'s gun violence is driven by a small number of people,
study says, NPR, Feb. 21, 2022, available at https://dcist.com/story/22/02/18/majority-of-dc-
homicides-driven-by-small-group/ (last accessed on Jan. 7, 2024).
[44] Id.
[45] Case 21-cr-27, ECF No. 24-1, p. 1.

walkway crew, and in food services.  While on supervision he completed drug treatment, substance abuse testing, vocational services, mental health treatment, and educational services and successfully completed supervision in 2019.  From his release from prison in 2016 to 2021, Mr. Byrd was employed, remained primarily drug free, and did not engage in criminal activity.

### III.  The Purpose of Sentencing Will be Accomplished with the Requested Sentence.

The Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553 (a).

### A.  A Below-Guidelines Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense.  Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[46]

### B.  The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.

Under 18 U.S.C. §§ 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed— . . . to afford adequate deterrence to criminal conduct...[and] to

---

[46] *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99)

protect the public from further crimes of the defendant."

Lengthy prison sentences do not mean the public is safe.  A 2017 Vera Institute of Justice

analysis shows that higher incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence).  **In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs**….[47]

While "[p]rison is an important option for incapacitating and punishing those who

commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening"

effect and "produce at best a very modest deterrent effect."[48]  With respect to specific deterrence,

research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful

deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't

a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little

to deter crime."[49]

---

[47] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (last accessed on Sept. 29, 2021) (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/  (last accessed on Sept. 29, 2021) ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

[48] *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).

[49] *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").

In addition, United States Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety."[50]  This is consistent with a "body of research demonstrat[ing] that longer sentences do not reduce recidivism more than shorter sentences."[51]  Some studies have concluded that prison stays longer than 12 to 20 months have diminishing returns, causing higher recidivism.[52]  Similarly, a 2002 Department of Justice study "found that recidivism rates did not differ significantly among those released after serving 6 months or less compared to those serving sentences all the way up to 30 months in prison."[53]

With respect to general deterrence, studies also "indicate that long prison sentences have little or no impact on reducing the criminal behavior of the public at large" because "most people consider immediate circumstances and emotions instead of longer-term legal consequences when acting or reacting."[54]  Significantly, a 1997 study in Richmond, Virginia "found no deterrent effect associated" with a policy "that increased prison sentences for gun crimes by prosecuting them as federal crimes."  [55]

Significantly, there is no empirical research supporting the assumption that progressively tougher or punitive sanctions for repeat offenders are more effective than the same or lesser sanctions.[56]  "Scholarship in deterrence does not uniformly anticipate that more severe sanctions

---

[50] *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst., 21 (Jan. 2016).
[51] Austin, Brennan Ctr., *supra*, at 49.
[52] *Id*.
[53] *Id*. at 36.
[54] *Id*.
[55] *Id*. at 37.
[56] Daniel P. Mears & Joshua C. Cochran, *Progressively Tougher Sanctioning & Recidivism: Assessing the Effects of Different Types of Sanctions*, Journal of Research in Crime & Delinquency 1, 34 (2017).

will provide a greater specific deterrent, and some research suggests that they may worsen offending."[57]

With respect to sentencing disparities, U.S. Sentencing Commission research found that "Black male offenders received sentences on average 19.1 percent longer than similarly situated White male offenders," even accounting for any history of violence.[58]  The disparity was slightly greater for firearms offenses: from approximately 2011 through 2016, "Black male firearms offenders received sentences that were 19.3 percent longer than those for White male firearms offenders."[59]  "Black male offenders were [21.2 percent] less likely than White male offenders to receive a non-government sponsored downward departure or variance during the most recent period studied."[60]  In addition, "even when Black male offenders received a non-government sponsored downward departure or variance, their sentences were longer than White male offenders who received a non-government sponsored departure or variance."[61]

### C.      The Requested Sentence Would Provide Mr. Byrd with the Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed—. . . to provide the defendant with needed. . . medical care. . . in the most effective manner."  Mr. Byrd does not need to be detained in order to obtain educational and vocational training, nor does he need a lengthy sentence to accomplish these goals.  Mr. Byrd obtained his

---

[57] *Id.*

[58] U.S. Sent'g Comm'n, *Demographic Differences in Sentencing: An Update to the 2012* Booker *Report*, 2 (Nov. 2017).

[59] *Id.* at 29.

[60] *Id.* at 15, 20.

[61]  *Id.* at 20. When Black males received a government-sponsored below-guideline sentence for reasons other than substantial assistance, their sentences were 28.7 percent longer than White males who received such a sentence.  *Id.* at 12, fig. 8.

GED and has received vocational training.  Furthermore, he can enter this Court's rigorous

Rebuilding Our Lives Re-entry Court program.  Indeed, the Court can look to Mr. Byrd's efforts

to obtain education as proof that his own efforts of rehabilitation.

## IV.    The Requested Sentence Properly Reflects § 3553(a) Considerations.

When sentencing a defendant, the Court must treat the Guidelines "as one factor among

several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85,

90 (2007).  As stated above, courts should resist anchoring a sentence to the guideline numbers.

*See Docampo*, 573 F.3d at 1105 n.5 (Barkett, J., concurring and dissenting) ("Not only have

district courts now become used to relying on [the Guidelines], but the Guidelines inevitably

have a considerable anchoring effect on a district court's analysis").  Because the Guidelines

merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve

§ 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized

sentence that actually does achieve § 3553(a)'s objectives in the case before it.  *Rita*, 551 U.S. at

348, 350.  This Court may not presume that a Guideline sentence is reasonable and should,

instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a)

considerations and whether "the case warrants a different sentence regardless."  *Id.* at 351.

Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand,"

regardless of the guidelines range.  *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th

Cir. 2014) (Gorsuch, J.).  A U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate
> sentence, often at great length, but after the judge announces a decision, that
> judge, the lawyers, and the staff move on to the next case; the hearing and
> outcome soon fade into distant memory. Meanwhile, for the defendant, the torture
> of a monotonous existence begins, while life for his family moves forward
> without him. For him, every day, month and year that was added to the ultimate
> sentence will matter. The difference between ten and fifteen years may determine
> whether a parent sees his young child graduate from high school; the difference

> between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. **Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.**

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at \*3-4 (D. Md. Feb. 18, 2020) (emphasis added).

Mr. Byrd agrees that with an offense level of 16, and a Criminal History Category of V, Mr. Byrd's Guideline Range is 41 to 51 months' imprisonment. But in light of Mr. Byrd's upbringing and future needs, the defense requests that the Court vary down from the guidelines. Such a variance is eminently warranted.

First, Mr. Byrd's criminal history category in fact *overstates* the seriousness of his criminal history and likelihood of recidivism and therefore supports a downward variance or departure. *See* U.S. Sentencing Guidelines §4A1.3 ("If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."). In support, Mr. Byrd notes that two of the three offenses contributing criminal history points were committed at ages 18 and 20, as reflected in the table below. Similarly, the other criminal conduct listed in the PSR were committed at age 18 or age 20, with the lone exception being one charge of which he was acquitted. Mr. Byrd also notes a significant period of time between 2016 and 2021 in which he was employed, remained largely drug free, and did not engage in criminal activity.

| Charge | Date of Sentencing | Age at Arrest | Criminal History Points |
|---|---|---|---|
| Robbery, 2010 CF2 007646 (D.C. Superior Court) | 9/8/2010 | 18 | 3 |

| Unlawful Possession of a Firearm, 12-cr-280 (D.D.C.) | 6/5/2013 | 20 | 3 |
|---|---|---|---|
| Unlawful Possession of a Firearm, 21-cr-27 (D.D.C.) | 7/9/2021 | 29 | 3 |
| Offense committed while on release | | | 2 |
| Total | | | 11 points |

As the Sentencing Commission itself has recognized "[a]ge (including youth) may be relevant in determining whether a departure is warranted . . . ." §5H1.1.  In fact, the Sentencing Commission is presently considering amendments that would significantly discount (or eliminate) the criminal history points that attach to youthful offenses in light of the "[s]cientific studies on brain development showing that psychosocial maturity, which involves impulse control, risk assessment, decision-making, and resistance to peer pressure, is generally not developed until the mid-20s." U.S. Sentencing Commission, Proposed Amendments 38 (Dec. 26, 2023), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231221_rf-proposed.pdf; *see also id.* (considering adding language that "A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense. In an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing."). That body of research is tremendously robust and has made clear a medical consensus that brain development is not complete by the age of eighteen. Indeed, a plethora of recent studies demonstrate that neurological systems involved in self-regulation and higher-order cognition continue to develop well into the mid-twenties. *See, e.g.*, A. Cohen, et al., *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 4 Psychological Science 549, 559

(2016) ("[T]hese findings suggest that young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry."); L. Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Dev. Rev. 78 (Mar. 2008) (noting that "rates of risk-taking are high among 18- to 21-year-olds" and far less so among adults over age 25). The U.S. Sentencing Commission in its report on Youthful Offenders in the Federal System also defined youthful offenders as those *"age 25 or younger* at the time they are sentenced in the federal system" in light of "recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." U.S. Sentencing Commission, *Youthful Offenders in the Federal System* 1, 5 (May 2017) (emphasis added).

The takeaway from the Commission's findings and the robust body of neuroscientific research is that this Court should *discount* the relative weight of the robbery and initial felon-in-possession offenses committed by Mr. Byrd when he was 18 and 20 years old, respectively, along with other conduct listed in the PSR which Mr. Byrd committed at the same ages. The facts of the robbery and initial FIP show that Mr. Byrd was acting impulsively together with his peers and the science supports that his teenage/young adult brain was highly susceptible to risk-taking impulses and "negative emotional influences." *See* Cohen, *supra*, at 560. This Court should vary or depart downwards because Mr. Byrd criminal history (peppered with youthful and young adult offenses) actually *overrepresents* his true dangerousness and risk of recidivism.

Indeed, corroborating the findings of the body of medical and social science research, Mr. Byrd's criminal history shows that once he reached the age of 24, his criminal activity significantly lessened. As the government recognizes, the PSR does not assign criminal history

points for any offenses between 2010 and 2021, and between 2016-2019 Mr. Byrd was gainfully employed, refrained from using illicit substances,[62] and did not commit additional crimes. As explained *infra*, he maintains that he was innocent of the 2019 acquitted conduct referenced by the government, and notes that his recent behavior (resulting in two FIP convictions) is informed by the  traumatic impact of his mother's disappearance and homelessness, his trauma from being the victim of gun violence, and the loss of his friend due to gun violence.

Mr. Byrd also submits that there is no support for the Court to vary *upwards* on the basis that Mr. Byrd's criminal history score underrepresents his dangerousness. Not only does his criminal history consist mostly of youthful and young adult offenses that should actually be discounted, as explained *supra*, but any upwards variance would constitute unlawful double-counting of the convictions that already comprise his criminal history calculation. Varying upwards would also represent impermissible consideration of the non-convictions in Mr. Byrd's criminal history which were either youthful offenses or dismissed or acquitted conduct irrelevant to Mr. Byrd's instant offense and the likelihood of recidivism. These offenses, for reasons explained *supra*, should logically be left out of any criminal history analysis.

The government seeks to introduce acquitted conduct from Mr. Byrd's trial in D.C. Superior Court Case No. 2019 CF1 006212[63] on a charge of Accessory After the Fact to Assault with Intent to Kill While Armed. But that case similarly cannot provide a basis for an upwards variance because Mr. Byrd was acquitted of wrongdoing in that case and the circumstances of that charge bear no relevance to the instant offense. Precisely because of the equitable quandary reflected in a judge's use of *acquitted conduct* to punish a defendant, the U.S. Sentencing

---

[62] Per the PSR, he tested positive once.
[63] Mr. Byrd's case number is 2019 CF1 009640.  His co-Defendant is charged in case number 2019 CF1 006212.

Commission is presently considering amending the guidelines to diminish or eliminate the role that acquitted conduct plays in the guidelines analysis. *See* Proposed Amendments 40 (considering "Downward Departure Consideration for Acquitted Conduct" and/or proof of engaging in acquitted conduct by clear and convincing evidence). For the same reasons, that acquitted conduct should bear no role in this Court's sentence. Mr. Byrd was acquitted of the Accessory charge by a jury, and there is simply no basis for the government's attempt to minimize that acquittal by attributing it to a mere "hair style . . . change[]." Gov't Sent. Memo at 6. In fact, there were ample reasons why the jury had reasonable doubt as to the government's case against Mr. Byrd, including the failure of several of the government's witnesses to identify Mr. Byrd in court as the driver of the vehicle in question. Mr. Byrd maintains his innocence in that case, and a jury found him not guilty. Varying upwards based on this acquitted conduct, which bears no relevance to any conduct in the instant offense and was not proven by a preponderance of the evidence or clear and convincing evidence, would be unreasonable, inequitable, and unlawful.

Finally, a downward variance is warranted because of Mr. Byrd's mitigating life circumstances. As he noted above, Mr. Byrd has lacked consistent parental and adult presence in his life, shifting homes frequently, and has suffered from the disappearance and homelessness of his mother, who as the PSR noted had become unrecognizable while living in a tent on the street. The hardships of his upbringing, the trauma he faced being shot and the loss of his friend due to gun violence have taken a toll on Mr. Byrd and caused him to recently turn back to criminal activity, despite having remained crime free, substance free, and gainfully employed for years. Even with the loss of his friend which caused to him to drink daily to cope with the loss, he was able to stop on his own.  Despite significant challenges, he has obtained a GED, sought out

lawful employment, and abstained from substances. This Court should consider these mitigating

factors, along with the fact that his criminal activity overwhelmingly dates back more than a

decade, to when he was barely into young adulthood, which in itself a mitigating factor (as

described *supra*).

**V.      The Requested Sentence Would Not Create An Unwarranted Sentencing Disparity.**

Felon-in-possession cases do not demand a lengthy sentence of incarceration.  Notably,

when looking at the subcategory of 922 (g) cases, judges in this Court have varied substantially

from the Guidelines.  *In United States v. Simmons*¸19-cr-409 (KBJ), the Court varied and

sentenced the defendant to time-served in a 922 (g) case where the guideline range was 12 to 18

months and the defendant agreed he possessed an actual firearm.  In *United States v. Juamal*

*Carroll*, 19-cr-407 (ABJ), the Court varied and sentenced the defendant to 18 months, concurrent

to an expected nine-month sentence for violation for supervised release where the guideline

range was 30 to 37 months.  And in *United States v. Christopher Carroll*, 20-cr-16 (JEB), the

Court varied and sentenced the defendant to a sentence of a year and one day where the guideline

range was 30 to 37 months.  In *United States v Tyeree Young*¸19-cr-366 (TSC), the Court varied

to a time-served sentence (approximately two weeks) where the Probation Office had calculated

an 18 to 24 months guideline range.  In *United States v. Antone Watkins*, 20-cr-19 (CRC), the

guideline range was 30 to 37 months, and the defendant was sentenced 14 months.

In cases where defendants have had prior gun possession offense or violent prior records,

the judges on this Court have sentenced within or below the guideline range.  In *United States v.*

*Van Dyke, Jr*., 19-cr-344 (JEB), the Court varied downward and sentenced the defendant to time-

served in a 922(g) case where the guideline range was 37 to 46 months.  In that case, the

defendant had a prior conviction for carjacking and had made extraordinary efforts at

rehabilitation while on pretrial release.  In *United States v. Norris*, 22-cr-35 (TFH), the defendant was on supervision for a manslaughter and was arrested with a firearm. The district judge imposed a sentence of 18 months, where the guideline range was 30 to 37 months.  In *United States v. Williams*, 20-cr-37 (DLF), the Court varied down to 30 months, where the guideline range was 41-51 months.  In that case, the defendant was arrested for gun possession and multiple guns and ammunition were recovered from the defendant's home and where the defendant had a prior conviction for first-degree murder for which he had served 15 years.  The Government's recommended sentence would thus create a sentencing discrepancy for 922(g) cases.

Sentencing Commission data shows that from 2017 to 2021, individuals in Criminal History Category V sentenced under the firearms guidelines in Washington, D.C. were sentenced to a median sentence of 35 months.[64]

---

[64] See Exhibit 1 also pictured above.



Hence, Mr. Byrd's requested sentence would not present a sentencing disparity under the guidelines.

## <u>Conclusion</u>

For the foregoing reasons, and for any other reasons set forth at the sentencing hearing, a sentence below the guidelines sufficiently addresses Mr. Byrd's conduct as well as other factors pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Alexis M. Gardner
Isra J. Bhatty
Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500